UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:24-CR-121 JAR |
| | ) | |
| CRAIG SPIEGEL, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

## GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

### 1. PARTIES:

The parties are the defendant Craig Spiegel (the "defendant") represented by defense counsel T.J. Matthes, and the United States of America (hereinafter "United States" or "Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

### 2. GUILTY PLEA:

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the defendant's voluntary plea of guilty to Counts 13, 18, and 21 of the charge, the Government agrees that no further federal prosecution will be brought in this District against the defendant relative to the Indictment filed on March 13, 2024, of which the Government is aware at this time.

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty

1

plea.  The parties further agree that (1) the Government will not request that the defendant serve consecutive sentences as to the counts to which he is pleading guilty, and (2) either party may request a sentence above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a).  The parties further agree that notice of any such request will be given no later than ten days prior to sentencing and that said notice shall specify the legal and factual bases for the request.

The defendant also agrees, pursuant to the guilty plea to Counts 13, 18, and  21 of the Indictment, to forfeit to the United States all property subject to forfeiture under the applicable statutes, including but not limited to: a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offenses.

## 3.  ELEMENTS:

As to Count 13, the defendant admits to knowingly and intentionally violating Title 21, United States Code, Section 841(a)(1), and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

**One**, the defendant intentionally distributed a controlled substance;

**Two**, at the time of distribution, the defendant knew that it was a controlled substance; and

**Three**, the defendant knowingly or intentionally prescribed the controlled substance other than for a legitimate medical purpose in the usual course of professional practice.

As to Count 18, the defendant admits to knowingly violating Title 21, United States Code, Section 846, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

2

**One**, two persons reached an agreement or came to an understanding to illegally distribute controlled substances;

**Two**, the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and

**Three**, at the time the defendant joined in the agreement or understanding, he knew its illegal purpose.

As to Count 21, the defendant admits to knowingly violating Title 18, United States Code, Section 1035, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

**One**, the defendant made a statement or representation in a matter involving a health care benefit program;

**Two**, the statement or representation was in connection with the delivery of or payment for health care benefits, items, or services;

**Three**, the statement or representation was material to a health care benefit program;

**Four**, the statement or representation was false, fictitious, or fraudulent; and

**Five**, the defendant made the statement knowingly and willfully.

4. **FACTS:**

The parties agree that the facts in this case are as follows and that the Government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

<u>**Defendants**</u>

a.    The defendant admits that, at all relevant times, he was a medical doctor licensed to practice medicine in the state of Missouri and owned and operated a pediatric clinic located at

3

12255 DePaul Drive, Suite 380, Bridgeton, Missouri 63044 in St. Louis County and the Eastern District of Missouri ("the Clinic").

b.      The defendant admits that co-defendant April Bingham ("Bingham") has never held any medical licenses or received any sort of medical training. The defendant further admits that he met Bingham prior to 2021 through a mutual friend.

### Relevant Provisions Concerning Controlled Substances

c.      Federal and state law classify certain prescription medications as "controlled substances." Controlled substances are drugs that have some potential for abuse or dependence.

d.      In order to prescribe controlled substances, a licensed health care professional, such as a physician, must obtain a registration number from the Drug Enforcement Administration ("DEA") and must comply with all DEA regulations and all applicable federal laws. Controlled substances may be dispensed lawfully by means of a prescription issued by an individual DEA-registered practitioner, such as a physician, if the prescription is issued for a legitimate medical purpose by the individual DEA-registered practitioner acting in the usual course of his or her professional practice. 21 C.F.R. § 1306.04(a).

e.      Controlled substances are placed into five schedules, based on the potential for abuse and the severity of the effects if a person abuses the drug. Placement of a controlled substance within a schedule depends on the drug's medical use, potential for abuse, and risk of dependence. 21 U.S.C. § 812(b).

f.      Of the controlled substances that may be legally prescribed, schedule II controlled substances have the highest potential for abuse and may cause severe psychological or physical dependence. 21 U.S.C. § 812(b)(2). Dextroamphetamine/amphetamine (also known as Adderall) is an example of a schedule II controlled substance.

4

g.    Schedule III drugs have a lower potential for abuse than schedule II drugs, but a higher potential for abuse than schedule IV drugs, and may lead to physical or psychological dependence when abused.  21 U.S.C. § 812(b)(3).  Codeine is an example of a schedule III controlled substance.

h.    Schedule IV drugs have a lower potential abuse than schedule II and schedule III drugs but still may lead to physical or psychological dependence when abused.  21 U.S.C. § 812(b)(4). Alprazolam (also known as Xanax) is an example of a schedule IV drug.

i.    The defendant admits that scheduled drugs have a street value and diversion potential.  "Diversion" refers to the unauthorized transfer of any controlled substance from an individual or entity to another individual or entity.  In the context of a DEA-registered physician, diversion includes the issuing of a prescription for no legitimate medical purpose by the practitioner acting outside of the usual course of his or her professional practice.

j.    The defendant admits that, at all relevant times, he was aware of certain indicators of diversion of controlled substances, commonly referred to in the medical community as "red flags."  An example of such a "red flag" is refilling a controlled substance medication too far in advance of when the previous prescription was scheduled to run out based on the prescribed dosing and instructions.  Other examples of "red flags" are combinations of certain classes of drugs that are commonly known to enhance the euphoric or addictive effect of the medications.  An example of such a combination is comprised of an opioid, a benzodiazepine, and a stimulant and/or a muscle relaxer; this combination is colloquially known as the "holy trinity."  The defendant admits that he knew that issuing prescriptions for controlled substances despite the presence of "red flags" was not only wrong, but also presented a danger to the well-being of the designated recipient of

the controlled substances (i.e. the purported patient) and to the community at large if the recipient, in turn, sold or transferred the prescribed controlled substances to someone else.

k.    The defendant admits that, at all relevant times, he was registered under the provisions of the Controlled Substance Act, 21 U.S.C. § 823 *et seq.*, as a practitioner and had been assigned a DEA registration number ending in 6438 authorizing him to prescribe controlled substances under schedules II through V.

**The Medicare Program**

l.    The United States Department of Health and Human Services, through the Centers for Medicare & Medicaid Services ("CMS"), administers the Medicare program, which is a federal health benefit program, 18 U.S.C. § 24(b), for the elderly and disabled.

m.    Benefits are administered through different parts of the Medicare program, referred to as Part A, Part B, Part C, and Part D. Part D is relevant to this case.

n.    Medicare Part D is an optional prescription drug benefit program. 42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a). It is based on a private market model. Medicare contracts with private entities known as Part D "Plan Sponsors" to administer prescription drug plans and deliver Part D, *i.e.* prescription, benefits to enrolled beneficiaries. Throughout the year, CMS makes monthly payments to the Part D Plan Sponsor for each Part D beneficiary enrolled in the plan. 42 C.F.R. § 423.329(a)(1).

o.    Medicare only covers drugs that are used for a medically accepted indication, which means a use that is approved under the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.*, or a use which is supported by one or more citations included or approved for inclusion in one of the specified compendia. 42 U.S.C. § 1395w-102(e)(1) & (e)(4); 42 U.S.C. § 1396r-8(g)(1)(B)(i) & (k)(6); 42 C.F.R. § 423.100.

6

p.    Prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as for recreational use, are not for "medically accepted indications" and are therefore not covered Medicare Part D drugs. 42 U.S.C. § 1395w-102(e)(1). Similarly, prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as for recreational use, are not "valid prescriptions" and are therefore not covered Medicare Part D drugs. 42 C.F.R. § 423.104(h).

q.    When a beneficiary has Part D coverage, he or she can take a physician's prescription to a participating pharmacy to have the prescription filled. The pharmacy then seeks reimbursement for the prescription from the Part D sponsor and, in many cases (depending on the beneficiary's Part D plan), may seek a co-pay from the beneficiary, as well. Thus, as a general matter, both the Medicare program and patients pay the cost of covered prescriptions.

### The Medicaid Program

r.    Illinois Medicaid and Missouri Medicaid are federal health care benefit programs, 18 U.S.C. § 24(b), that reimburse health care providers for covered services and prescription medications provided to eligible low-income or disabled Medicaid recipients. Illinois Medicaid and Missouri Medicaid are jointly funded by Illinois and Missouri, respectively, and, through CMS, the federal government.

s.    Illinois Medicaid and Missouri Medicaid provide coverage for prescription drugs only when used for medically accepted indications.

### The Defendant's Illegal Prescribing of Controlled Substances

t.    The defendant admits that, from at least as early as in or about 2014 to at least as late as May 2023, he engaged in a pattern of issuing controlled substance prescriptions for no legitimate medical purpose and outside of the usual course of his professional practice.

7

u.      More specifically, the defendant admits that he repeatedly and frequently issued controlled substance prescriptions to numerous adult women—many of whom he met because he was their treating pediatrician when they were children—in exchange for sexual acts and sexual photographs, without regard for the patient's medical condition or the medical necessity of the prescription. The defendant admits that, in a multitude of such instances, he issued such prescriptions even though he knew that the recipient of the controlled substance prescription had a substance use disorder and that issuing the prescription would endanger the recipient's mental wellbeing and physical safety.

v.      The defendant admits, by way of example, that C.S. received controlled substance prescriptions from the defendant, who C.S. met through a mutual friend. On numerous occasions, C.S. performed sexual acts for the defendant, typically at the Clinic, in exchange for the defendant issuing prescriptions to C.S. for controlled substances, including amphetamine/dextroamphetamine salts (a schedule II stimulant also known by its brand name, Adderall) and oxycodone-acetaminophen (a schedule II narcotic also known by its brand name, Percocet). The defendant admits that, on other occasions, C.S. provided the defendant with nude photographs of herself in exchange for the controlled substance prescriptions.

w.      The defendant admits that another adult woman, J.M., received controlled substance prescriptions from the defendant in exchange for numerous sexual photographs. The admits that controlled substances that he issued to J.M. included hydrocodone-acetaminophen (also known by its brand name Lortab or Norco) and hydrocodone chlorpheniramine extended release suspension (also known by its brand name Tussionex), both schedule II controlled substances. The defendant admits that he continued to issue these types of prescriptions to J.M.

8

even though she repeatedly requested early refills of these medications, a common "red flag" of diversion, as the defendant knew.

x.      The defendant admits that he also regularly issued controlled substance prescriptions to N.L., who provided sexual acts (sometimes at the Clinic and at times at N.L.'s home) and photographs in exchange for those controlled substance prescriptions, which were typically for mixed amphetamine salts (a schedule II stimulant), and—on at least a few occasions—hydrocodone-acetaminophen (a schedule II narcotic). The defendant admits that he issued one such hydrocodone prescription to N.L. on February 11, 2021.

y.      The defendant admits that, although he knew N.L. had a severe substance use disorder and was at high risk of overdose, he continued to prescribe her dangerous combinations of high-strength controlled substances (including the "holy trinity") while frequently pressuring her, via text messages, into committing sexual acts or sending nude photographs. The defendant admits that, on April 4, 2022, at the age of 40 years old, N.L. was found deceased in her home due to an overdose. It is the defendant's position that there is no evidence that the prescription drugs he provided to N.L. caused her death.

z.      The defendant admits that additional women to which he issued invalid prescriptions for controlled substances in exchange for sexual acts or sexual photographs included, but were not limited to, K.D., A.R., N.W., and E.G.

aa.     The defendant admits that, in engaging in the acts described above, he often exerted pressure on the women to whom he distributed controlled substances to engage in sexual acts with him. For example:

> 1.  The defendant admits that when C.S. told him that she had limited time to meet with him, he replied in a text, "In other words I will have 15 minutes to address

9

your nipples." The defendant admits that he later added, "Hopefully we won't be rushed too much. Wear less layers."

2. The defendant admits that, after electronically transmitting controlled substance prescriptions to a pharmacy for K.D., the defendant texted her, "Sent, even though I don't see boobs or nipples." The defendant admits that he then added, "You see, I sent the prescriptions assuming that you would hold up your end."

3. The defendant admits that when J.M. requested Spiegel to prescribe her a controlled substance, the defendant replied, "Tomorrow, after I see you,"and then asked her, "How are your tan lines?"

4. The defendant admits that, in pressing N.L. for sexual photographs, he told her, "Surprise surprise. No pictures!!" The defendant admits that he later added, "I guess there is no point in getting upset. Our interaction is usually a one way street. I do the things that I promised. You promise much, but seldom follow through. I am not sure why you waste your breath promising anything."

bb. The defendant admits that he knew that the controlled substance prescriptions that he issued to adult women were illegal, in that he issued them other than for a legitimate medical purpose in the usual course of professional practice. The defendant admits that, at times, he refused to issue certain prescriptions for fear of being caught, texting the requestors of the controlled substances messages such as: "I can't. The government is very intrusive lately"; "Too soon. The state is cracking down"; and "I can't. Sent the Norco relatively recently. The DEA is watching more carefully."

cc. Although the amount of controlled substances attributable to the defendant's illegal prescribing of controlled substances is difficult to calculate with precision, the parties are in

10

agreement that, based upon the known evidence and including relevant conduct, the defendant is accountable for illegally distributing 11,092.21 kilograms in converted drug weight, as set forth below:

| Controlled Substance | Converted Drug Weight |
|---|---|
| Dextroamphetamine/amphetamine | 10,753.20 KG |
| Oxycodone | 39.87 KG |
| Hydrocodone | 294.40 KG |
| Methylphenidate | 0.56 KG |
| Schedule III substances | 2.23 KG |
| Schedule IV substances | 1.95 KG |

### Conspiracy to Distribute Controlled Substances

dd.    The defendant admits that, beginning, at latest, in or about April 2021, he and Bingham conspired to illegally prescribe controlled substances, as further described below.

ee.    The defendant admits that he issued controlled substance prescriptions to Bingham outside of the usual course of professional practice and other than for a legitimate medical purpose, as further described below.

ff.    The defendant admits that he issued controlled substance prescriptions to Bingham in exchange for sexual favors.  The defendant further admits that, as he knew, Bingham at times sold some of the controlled substances that the defendant had prescribed to her.  The defendant admits that, although he knew that Bingham was selling controlled substances prescribed by him, he continued to prescribe controlled substances, including dextroamphetamine/amphetamine, to Bingham.

gg.    The defendant admits that, at all relevant times, he knew Bingham was addicted to dextroamphetamine/amphetamine, and that he nonetheless continued to prescribe it to her.  The defendant also admits that he never requested Bingham to undergo a urinalysis and he never made

11

any sort of attempt to ensure that (1) she was taking the drugs he prescribed to her in accordance with the directions on the prescriptions; (2) she was not taking illicit drugs; or (3) she was not taking other prescription drugs that could interact dangerously with the medications he was prescribing to her.

hh.    The defendant admits that, at Bingham's requests, he agreed to prescribe controlled substances to Bingham using the identities of third-party individuals, including Bingham's ex-husband, mother, and friends. The defendant further admits that the purpose of using third-party identities was sometimes to take advantage of such individuals' prescription insurance benefits, and was sometimes to conceal from pharmacies the high frequency with which the defendant was prescribing controlled substances to Bingham.

ii.    The defendant admits that Bingham introduced him to new individuals, some of whom paid the defendant in cash for prescriptions for controlled substances, and some of whom provided sexual favors to the defendant in exchange for prescriptions for controlled substances. The individuals who received controlled substance prescriptions from the defendant in exchange for sexual favors or cash after being introduced to him by Bingham include G.A., T.S., N.O., T.K., L.S., S.C., and K.M.

jj.    Although the amount of controlled substances attributable to the defendant's participation in the conspiracy to illegally distribute controlled substances is difficult to calculate with precision, the parties are in agreement that, based upon the known evidence and including relevant conduct, the defendant is accountable for illegally distributing 1,063.85 kilograms in converted drug weight, as set forth below:

| Controlled Substance | Converted Drug Weight |
|---|---|
| Hydrocodone | 1.47 KG |
| Dextroamphetamine/amphetamine | 1,062.00 KG |

| Controlled Substance | Converted Drug Weight |
|---|---|
| Schedule IV substances | 0.37 KG |

**False Statements Related to Health Care Matters**

kk.     The defendant admits that, in addition to issuing invalid prescriptions for controlled substances, as described above, he also issued non-controlled substance prescriptions to adult women, without making a determination of medical necessity, in exchange for sexual acts and photographs.

ll.     The defendant admits that, as he knew, many of the non-controlled substance prescriptions that he issued without making a medical necessity determination were presented to pharmacies for reimbursement by federal health care programs, including Medicare and Medicaid.

mm.     The defendant further admits that, as he knew, many of the prescriptions for controlled substances that he issued for no legitimate medical purpose and outside of the usual course of professional practice, were presented to pharmacies for reimbursement by federal health care programs, including Medicare and Medicaid.

nn.     The defendant admits, by way of example, that on or about April 30, 2022, he issued a prescription for oxycodone, a schedule II controlled substance and opioid, to C.S., knowing that C.S. had an opioid addiction and that the oxycodone was issued to C.S. outside of the usual course of professional practice and without a legitimate medical purpose. The defendant admits that he issued the oxycodone prescription to C.S. in exchange for sexual favors and that Medicare paid $23.20 for a claim submitted by the pharmacy that filled C.S.'s oxycodone prescription.

oo.     The defendant admits that, if Medicare and Medicaid had known that the defendant's prescriptions for controlled and non-controlled substances were issued in exchange for sexual favors or photographs, without making a determination of medical necessity, Medicare

13

and Medicaid would not have made payments in relation to the claims associated with such prescriptions.

pp.    The defendant admits that, if Medicare and Medicaid had known that the defendant's prescriptions for controlled and non-controlled substances were issued in exchange for cash, without making a determination of medical necessity, Medicare and Medicaid would not have made payments in relation to the claims associated with such prescriptions.

qq.    The defendant admits that, as a result of his false statements related to health care matters, he is accountable for a total loss of $114,480.36 caused to the Medicare, Missouri Medicaid, and Illinois Medicaid programs, as set forth below:

| Payor | Loss Amount |
|---|---|
| Medicare | $25,664.03 |
| Missouri Medicaid | $86,669.10 |
| Illinois Medicaid | $2,147.23 |

### The Defendant's Admissions to Each Count

#### Count 13: 21 U.S.C. § 841(a)(1)

rr.    The defendant admits that that he knowingly and intentionally prescribed a controlled substance outside of the usual course of professional practice and without a legitimate medical purpose.  The defendant admits that he signed a prescription for a controlled substance (namely, hydrocodone) dated February 11, 2021, that was written in the name of N.L.  The defendant admits that he did not conduct any medical decision-making prior to signing that prescription for N.L. and that he had a sexual relationship with N.L.  The defendant further admits that he knew that N.L. had a substance abuse disorder, that he never drug tested N.L., and that he knew that prescribing hydrocodone to N.L. compromised her health and safety.

14

### Count 18: 21 U.S.C. § 846

ss.    The defendant admits that admits that, beginning, at latest, in or about April 2021 and continuing to at least as late as April 2023, the defendant conspired with Bingham to issue prescriptions for controlled substances other than in the usual course of professional practice for a legitimate medical purpose.  The defendant admits that, during the conspiracy, he prescribed controlled substances, including dextroamphetamine/amphetamine, to Bingham in exchange for sexual photographs and favors, even though he knew that Bingham had a substance use disorder and that prescribing her dextroamphetamine/amphetamine compromised her health and safety. The defendant further admits that, during the conspiracy, he and Bingham conspired to use the identities of third parties when issuing prescriptions for controlled substances, in order to take advantage of those individuals' health insurance benefits and to conceal from pharmacies the frequency with which the defendant was prescribing controlled substances to Bingham.  Finally, during the conspiracy, Bingham introduced the defendant to new individuals, to whom he prescribed controlled substances in exchange for sexual photographs, sexual favors, or cash.

### Count 21: 18 U.S.C. § 1035

tt.    The defendant admits that he knowingly and willfully made and used a materially false document, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services involving the Medicare program, a health care benefit program as defined in 18 U.S.C. § 24(b), in that the defendant falsely represented by issuing the prescription for oxycodone described in the table below that he had made a determination that the oxycodone therein prescribed was medically necessary, when the defendant then and there well knew that the oxycodone was not medically necessary, was prescribed to an individual with which he had a sexual relationship, and

15

that the prescription was therefore not reimbursable by the Medicare program, and the defendant then and there well knew that the representations in that prescription were false, fictitious, and fraudulent:

| Patient | Prescriber | Claim Date | Drug | Quantity | Payor | Amount Paid |
|---------|-----------|-----------|------|----------|-------|-------------|
| C.S. | Craig Spiegel | 4/30/2022 | Oxycodone-acetaminophen 10-325 mg tablet | 40 | Medicare | $23.20 |

### Obstruction

uu.    The defendant admits that, at the April 8, 2025 hearing on his Motion to Suppress (ECF No. 115) in this case, he testified under oath that, during the Bridgeton Police Department investigation that precipitated this case, he did not sign a consent form authorizing the search of his cellular phone on August 31, 2022. The defendant admits that he testified that he signed the consent form on September 1, 2022, after the cellular phone data had been extracted by investigators. The defendant admits that this testimony was an effort to accuse Bridgeton investigators of illegally searching his cellular phone prior to him signing a consent form authorizing the same.

vv.    The defendant admits that this testimony was contrary to the testimony of three other witnesses and documentary evidence admitted throughout the multi-day suppression hearing. The defendant admits that the United States Magistrate Judge issued an order stating that he did "not credit Defendant's testimony" and that, "[t]o the extent Defendant is attempting to claim he did not sign the consent form until September 1, 2022, such an assertion is completely belied by the evidence."

16

**5. <u>STATUTORY PENALTIES</u>:**

The defendant fully understands that the maximum possible penalty provided by law for the crime of illegally prescribing a controlled substance, as charged in **Count 13**, is imprisonment of not more than 20 years, a fine of not more than $1,000,000.00, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than three years.

The defendant fully understands that the maximum possible penalty provided by law for the crime of conspiracy to distribute controlled substances, as charged in **Count 18**, is imprisonment of not more than 20 years, a fine of not more than $1,000,000.00, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than three years.

The defendant fully understands that the maximum possible penalty provided by law for the crime of false statements related to health care matters, as charged in **Count 21**, is imprisonment of not more than five years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than three years.

**6. <u>U.S. SENTENCING GUIDELINES (2024 MANUAL)</u>:**

The defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following are the applicable U.S. Sentencing Guidelines Total Offense Level provisions.

a. **Chapter 2 Offense Conduct:**

(1) **Base Offense Level:**

As to **Count 13**, the parties agree that the base offense level is 34, as found in Section 2D1.1(c)(3). The parties agree that the quantity of controlled substances for which the defendant is accountable, including relevant conduct, is at least 10,000 kilograms but less than 30,000 kilograms of converted drug weight resulting in the agreed Base Offense Level.

As to **Count 18**, the parties agree that the base offense level is 30, as found in Section 2D1.1(c)(5). The parties agree that the quantity of controlled substances for which the defendant is accountable, including relevant conduct, is at least 1,000 kilograms but less than 3,000 kilograms of converted drug weight resulting in the agreed Base Offense Level.

As to **Count 21**, the parties agree that the base offense level is 6, as found in Section 2B1.1(a)(2).

(2) **Specific Offense Characteristics:** The parties agree that the following Specific Offense Characteristics apply:

As to **Count 13**, the parties agree that two levels should be added pursuant to Section 2D1.1(b)(16)(B), because the defendant, knowing that an individual was unusually vulnerable due to a physical or mental condition, distributed a controlled substance to that individual or involved that individual in the offense.

As to **Count 18**, the parties agree that two levels should be added pursuant to Section 2D1.1(b)(16)(B), because the defendant, knowing that an individual was unusually vulnerable due to a physical or mental condition, distributed a controlled substance to that individual or involved that individual in the offense.

18

As to **Count 21**, the parties agree that eight levels should be added pursuant to Section 2B1.1(b)(1)(E), as the total loss amount to Medicare and Medicaid was more than $95,000 but less than $150,000. The parties further agree that two levels should be added pursuant to Section 2B1.1(b)(16) because the offense involved the conscious or reckless risk of death or serious bodily injury.

b. **Chapter 3 and 4 Adjustments:**

(1) **Acceptance of Responsibility:** The parties recommend that two levels should be deducted pursuant to U.S.S.G. § 3E1.1(a) because the defendant has clearly demonstrated acceptance of responsibility. If this deduction is applied, and if the defendant is otherwise eligible, then the Government moves to deduct one additional level pursuant to U.S.S.G. § 3E1.1(b), because the defendant timely notified authorities of the intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

The parties agree that the defendant's eligibility for this deduction is based upon information presently known. If subsequent to the taking of the guilty plea the Government receives new evidence of statements or conduct by the defendant which it believes are inconsistent with the defendant's eligibility for this deduction, the Government may present said evidence to the court, and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

(2) **Adjustment for Certain Zero-Point Offenders:** The parties agree that the defendant will not receive a two-level reduction under Section 4C1.1(a) irrespective of the Court's criminal history calculation because the defendant received an adjustment under Section 3A1.1

19

(vulnerable victims) pursuant to Section 4C1.1(a)(9) and the defendant received an adjustment under Section 3B1.1 (aggravating role) pursuant to Section 4C1.1(a)(10).

### (3) Other Adjustments:

As to **Count 13**, the parties agree that four levels should be added pursuant to Section 3B1.1(b)(3) because the defendant was an organizer or leader of a criminal activity that involved five or more participants and the conduct was otherwise extensive. The parties further agree that two levels should be added pursuant to Section 3B1.3, because the defendant abused a position of public or private trust. The parties further agree that two levels should be added pursuant to Section 3C1.1 because the defendant willfully obstructed the administration of justice with respect to the prosecution of the instant offense of conviction and the obstructive conduct related to the defendant's offense of conviction.

As to **Count 18**, the parties agree that four levels should be added pursuant to Section 3B1.1(b)(3) because the defendant was an organizer or leader of a criminal activity that involved five or more participants and the conduct was otherwise extensive. The parties further agree that two levels should be added pursuant to Section 3B1.3, because the defendant abused a position of public or private trust. The parties further agree that two levels should be added pursuant to Section 3C1.1 because the defendant willfully obstructed the administration of justice with respect to the prosecution of the instant offense of conviction and the obstructive conduct related to the defendant's offense of conviction.

As to **Count 21**, the parties agree that two levels should be added pursuant to Section 3A1.1 because defendant knew or should have known that a victim of the offense was a vulnerable victim. The parties further agree that two levels should be added pursuant to Section 3B1.3, because the defendant abused a position of public or private trust. The parties further agree that two levels

20

should be added pursuant to Section 3C1.1 because the defendant willfully obstructed the administration of justice with respect to the prosecution of the instant offense of conviction and the obstructive conduct related to the defendant's offense of conviction.

There are no other agreements by the parties as to applicable Sentencing Guidelines.

c. **Estimated Total Offense Level:** The parties estimate that the offense level for **Count 13** is 44. The parties estimate that the offense level for **Count 18** is 40. The parties estimate that the offense level for **Count 21** is 22.

d. **Grouping and Combined Offense Level:** The parties make the following estimates regarding grouping and the combined offense level: Pursuant to Section 3D1.2, Counts 13 and 18 group ("Group 1"), and the applicable offense level for Group 1 is 44. Count 21 is its own group ("Group 2"). Pursuant to Section 3D1.4, Group 2 is disregarded because it is nine or more levels less serious than Group 1. Group 1 therefore controls, for a total offense level of 44. The parties estimate that the **Total Combined Offense Level** is 41, if the defendant receives a three-point reduction for acceptance of responsibility.

e. **Criminal History:** The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

f. **Effect of Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline

21

despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

7. **WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:**

a. **Appeal:** The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

(1) **Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery and the guilty plea.

(2) **Sentencing Issues:** The parties agree to waive the right to appeal all sentencing issues except those related to: (1) application of Sentencing Guideline offense-level adjustments (including those based on criminal history) not specifically set forth in the plea agreement or non-application of adjustments specifically set forth in the agreement; (2) calculation of the defendant's criminal history category; or (3) substantive reasonableness of the sentence—above the Guideline range ultimately determined by the Court for appeals taken by the defendant, or below that range for appeals taken by the Government.

b. **Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

c. **Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought

22

under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8. OTHER:**

    **a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the Government.

    **b. Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:** Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

    **c. Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime the defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished.

    **d. Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $300, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

23

**e.  Possibility of Detention:**  The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

**f.  Fines, Restitution and Costs of Incarceration and Supervision:**  The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and costs of supervision.  The defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately.  Pursuant to Title 18, United States Code, Section 3663A, an order of restitution is mandatory for all crimes listed in Section 3663A(c).  Regardless of the Count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss.  The defendant agrees to provide full restitution to all victims of all charges in the indictment.

**g.  Forfeiture:**  The defendant knowingly and voluntarily waives any right, title, and interest in all items seized by law enforcement officials during the course of their investigation, whether or not they are subject to forfeiture, and agrees not to contest the vesting of title of such items in the United States.  The defendant agrees to abandon his interest in all seized items and further agrees that said items may be disposed of or destroyed by law enforcement officials in any manner without further notice.  By abandoning these items, the defendant waives any future rights to receive additional notice, a valuation of the items, or the opportunity to submit a claim to contest the disposition or destruction of the items that may exist under any policies or procedures of the seizing agency(ies).

The defendant agrees the stipulated facts above are sufficient to support forfeiture of certain assets pursuant to the applicable forfeiture authorities.  The defendant also agrees to the entry of a forfeiture money judgment against the defendant and in favor of the Government in the amount of $114,480.36.  The defendant agrees the Court may enter a consent preliminary order of forfeiture

24

any time before sentencing, and such Order will become final as to the defendant when it is issued and will be part of the sentence. The defendant agrees not to object to any administrative, civil, or criminal forfeiture brought against any assets subject to forfeiture. The defendant will execute any documents and take all steps needed to transfer title or ownership of said assets to the Government and/or to rebut the claims of nominees and/or alleged third party owners. The defendant knowingly and intelligently waives all constitutional, statutory, and equitable challenges to any forfeiture carried out in accordance with this plea agreement, including but not limited to that defendant was not given adequate notice of forfeiture in the charging instrument.

## 9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the Government to prove the elements of the offenses against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial

25

will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the Government's evidence and discussed the Government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the Government's case and any defenses.

The guilty plea could impact the defendant's immigration status or result in deportation. In particular, if any crime to which the defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

## 10. VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:

This document constitutes the entire agreement between the defendant and the Government, and no other promises or inducements have been made, directly or indirectly, by any agent of the Government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

26

11. **CONSEQUENCES OF POST-PLEA MISCONDUCT:**

After pleading guilty and before sentencing, if the defendant commits any crime, other than minor traffic offenses, violates any condition of release that results in revocation, violates any term of this guilty plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

12. **NO RIGHT TO WITHDRAW GUILTY PLEA:**

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the Government agrees to dismiss or not to bring.

12/10/25
Date

Amy E. Sestric, #66219MO
Assistant United States Attorney

12/08/2025
Date

Craig Spiegel
Defendant

12/10/25
Date

T.J. Matthes, #67563MO
Attorney for Defendant

27